UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **KEISHA M. HURST**<br>  **1811 Avenue O**<br>  **Fort Pierce, FL 34950**<br><br>      **Plaintiffs,**<br><br>      **v.**<br><br>**BENJAMIN S. CARSON, SR., M.D.,**<br>  **Secretary,**<br>**U.S. Department of Housing and Urban**<br>**Development,**<br><br>      **Defendant.** | **Civ. Action No.** |

## <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

1.)     This is an action by Keisha Hurst, an African American female formerly employed in the Employee and Labor Relations ("ELR") Division of the Office of the Chief Human Capital Officer ("OCHCO") at the Department of Housing and Urban Development ("HUD").

2.)     Between 2016 and 2018, ELR Division Director Joseph Sullivan (Caucasian male) discriminated and retaliated against Ms. Hurst on account of her race, color, disability and/or protected EEO activity and pressured her into taking increasingly severe, pretextual performance-based actions against one of her subordinates, Anita Crews (African American female).

3.)     When Ms. Hurst balked at Mr. Sullivan's efforts to unfairly target Ms. Crews, he then used Ms. Hurst's African American supervisor, Sonya Gaither, to take unwarranted adverse and materially adverse action against her (Ms. Hurst).  This included threatening to remove her from the federal service, issuing her pretextually low performance appraisals and unjustified

1

disciplinary action, and denying her request for a lateral transfer or detail away from the hostile work environment created by Mr. Sullivan.

4.) These actions and others caused Ms. Hurst to become severely depressed and suffer uncontrollable anxiety and other physical symptoms that required hospitalization. As a result, on July 23, 2018, she applied for a reassignment out of Mr. Sullivan's chain of command as a Reasonable Accommodation ("RA"). On September 21, 2018, HUD's RA Branch found that Ms. Hurst was a qualified individual with a disability who was eligible for Reasonable Accommodation.

5.) Neither Mr. Sullivan nor anyone else in OCHCO or the RA office took diligent or timely action to locate a new position for Ms. Hurst. The agency also wrongfully denied two subsequent RA requests by Ms. Hurst, who continued to work in the ELR Division until June of 2020 when she obtained a reassignment outside of OCHCO on her own.

6.) This case seeks redress for defendant's discrimination and retaliation toward Ms. Hurst that took the form of adverse and materially adverse employment actions; denial of and/or unreasonable delay in granting her requests for Reasonable Accommodation; and failure to implement the Reasonable Accommodations that were belatedly granted to her. It arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16 (incorporating 42 U.S.C. §§2000e-2, e-3); and the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§791 et seq.

7.) By way of relief, Ms. Hurst seeks compensatory damages; backpay for the unpaid leave she was forced to take as a result of HUD's delay and/or denial of her RA requests; restored sick and annual leave; record correction; declaratory and injunctive relief; and an award of attorneys' fees and costs.

## PARTIES, JURISDICTION AND VENUE

8.)    Plaintiff, Keisha Hurst, is an African American female of dark color who engaged in protected EEO activity beginning no later than June of 2017 and continuing through and with the filing of this case.  At all times relevant, Ms. Hurst has been employed by HUD.

9.)    From 2016 through the present, Ms. Hurst has resided in Florida.  Throughout that time until she was reassigned in June of 2020, she worked remotely for the ELR Division, which is based at HUD headquarters in Washington, D.C. and is headed by Mr. Sullivan.  Her management chain of command was located in Washington, D.C., and all of the agency actions that she is challenging were taken or not taken by managers in Washington, D.C.

10.)    Defendant Benjamin S. Carson, Sr., M.D., is the Secretary of Housing and Urban Development, the Cabinet official who heads HUD, and is sued in his official capacity only. HUD is a department in the Executive Branch of the federal government, whose mission includes providing and encouraging the provision of moderate and low-income housing.

11.)    Jurisdiction of this Court is based upon 28 U.S.C. §1332; 42 U.S.C. §2000e-16 (incorporating 42 U.S.C. §2000e-2, 3, 5(c)); the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§791 et seq., the analog for federal employees to the Americans With Disabilities Act, 42 U.S.C. §§12101, et seq., as amended by the Americans With Disabilities Act Amendments Act, Pub. Law 110-25; and the Civil Service Reform Act, 5 U.S.C. §5335.  Venue lies here pursuant to 42 U.S.C. §2000e-16 (incorporating 42 U.S.C. §2000e-5(f)(3)), because the actions of defendant at issue were taken in this judicial district where plaintiff was physically or remotely employed.  Apart from Ms. Hurst, virtually all of the witnesses or potential witnesses and evidence that will be involved in this case are located in Washington, D.C.

## STATEMENT OF FACTS

### Background

12.)   Ms. Hurst began working for the federal government in 2003.  At all times relevant to her claims, she was a qualified individual with a disability and/or was regarded as one by HUD and entitled to Reasonable Accommodation, as those terms are defined under 29 U.S.C. §794 (incorporating 42 U.S.C. §12112).

13.)   Ms. Hurst began in her position as a GS-14 Supervisory Labor and Relations Specialist (Headquarters Branch Chief) in ELR in September of 2014.  In that position, she was the first-level supervisor of Anita Crews, a GS-13 Human Resources Specialist.

14.)   Prior to engaging in protected EEO and Rehabilitation Act activity, Ms. Hurst routinely earned performance ratings at the Outstanding level and commensurate bonuses, both in the ELR Division and in her previous positions.

### Mr. Sullivan's Arrival as Director

15.)   Joseph Sullivan joined HUD as Director of the Employee and Labor Relations Division in February of 2016.

16.)   Michael Stein, a Caucasian male like Mr. Sullivan, was the Deputy Director of the ELR Division when Mr. Sullivan became the Director.  Mr. Stein had been Ms. Hurst's first-line supervisor since 2014.  He maintained an excellent professional relationship with her until he left ELR in early July of 2016.

17.)   Ms. Hurst and Ms. Crews also maintained a good working relationship with each other while Mr. Stein was Deputy Director and would have continued to do so but for the unlawful actions of Mr. Sullivan.

18.)   Upon Mr. Stein's departure, Ms. Hurst came under Mr. Sullivan's direct

4

supervision.  Shortly thereafter, she raised concerns with Chief Human Capital Officer Towanda Brooks that Mr. Sullivan was unfairly scrutinizing her work, interfering with the management of her subordinates, and unfairly assessing her performance.

19.)  Ms. Hurst's reporting chain ran directly to Mr. Sullivan until December of 2016, when Mr. Stein's replacement, Sonya Gaither (African American), was hired as Mr. Sullivan's Deputy.

### Ms. Hurst's Forced Initiation of Performance-Based Actions Against Ms. Crews

20.)  Due to her status as an African American woman of dark color, Mr. Sullivan used Ms. Hurst to carry out a series of adverse and materially adverse personnel actions against Ms. Crews with the intention of forcing her to resign or to terminate her employment from the federal government.

21.)  The first such action took place on September 19, 2016, when – as Mr. Sullivan wanted – Ms. Hurst placed Ms. Crews on a Performance Improvement Plan ("PIP").  A PIP is designed to identify areas of improvement for federal employees and can also be the first step toward removing a federal employee on grounds of poor performance.

22.)  The same day that she issued the PIP, Ms. Hurst also denied Ms. Crews a within grade salary increase.

23.)  In placing Ms. Crews on a PIP and withholding her within grade increase, Ms. Hurst did so to carry out Mr. Sullivan's wishes, not with the intention of herself putting Ms. Crews' job in jeopardy.

### Continued Pretextual Performance-Based Actions Toward Ms. Crews

24.)  Following the PIP, Ms. Hurst took several more performance-based actions against Ms. Crews as a result of pressure from Mr. Sullivan.  They included placing Ms. Crews on an

Opportunity to Improve Plan ("OIP") in December of 2016; issuing her another PIP in March of 2017; and rating her as "unacceptable" in three performance elements in her FY 2017 mid-year appraisal.

25.)    In September of 2017, Ms. Hurst – again acting as Mr. Sullivan's instrument – proposed Ms. Crews' removal on the false and pretextual basis that Ms. Crews' performance in one or more performance elements had declined.  Eventually, Ms. Hurst would disavow this action and prevent Sullivan from removing Crews as described in paragraphs 44 to 48, below.

26.)    Two months later, in November of 2017, Ms. Hurst denied Ms. Crews' request for reassignment as a Reasonable Accommodation.  She did so under the influence of Mr. Sullivan who was intent on removing Ms. Crews for unlawful reasons.

### Ms. Hurst's Initial Protected Activity

27.)    In the midst of issuing the performance-based actions to Ms. Crews, Ms. Hurst herself engaged in protected EEO activity by contacting HUD's EEO office on June 20, 2017 and filing an informal complaint on June 22, 2017 (HUD-00093-2017).

28.)    Ms. Hurst alleged that her mid-year performance appraisal, in which she had been rated as "Marginally Successful" in the critical element of Accountability, was the product of discrimination based on her race and color, and was "an act of retaliation" by Mr. Sullivan for failing to remove Ms. Crews under the OIP and raising complaints about him to senior managers. Ms. Hurst also alleged that Mr. Sullivan had created a hostile work environment for her by constantly interfering with the management of her subordinates, subjecting her and her subordinates to unfair scrutiny, and pressuring her to take unjustified action against Ms. Crews, among other actions.

29.)    In the informal complaint, Ms. Hurst described a conversation with Ms. Gaither in

which Ms. Gaither intimated that Mr. Sullivan may come after Ms. Hurst next because of "the way she [was] managing," i.e., her actions in passing Ms. Crews on the OIP.

30.)   Ms. Hurst elected to go to Alternative Dispute Resolution to resolve her complaint. After settlement discussions with Ms. Gaither were unsuccessful, Ms. Hurst decided not to pursue a formal complaint over the mid-year rating.

31.)   Mr. Sullivan would have been aware of her protected EEO activity in filing the informal complaint.

### Ms. Hurst's Affidavit in Support of Ms. Crews and HUD's Retaliation

32.)   In October of 2017, Ms. Hurst provided an affidavit in connection with Ms. Crews' EEO complaint.  Ms. Hurst stated:

> I want to add that I have had great pressure from Mr. Joseph Sullivan, ELRD Director and Ms. Gaither, ELRD Deputy Director to address Anita's performance issues . . . I felt that when Anita was placed on a PIP, Mr. Sullivan used it as a route to removal, not reform . . . I've shared my concerns for months with Ms. Sonya Gaither and others that Mr. Sullivan has targeted Anita.  Much of this has been based on my interaction with Mr. Sullivan regarding Anita's performance, his tone when he speaks about her … his phone call asking me how long it would take to remove Anita, and other reasons to include statements and conversations with Ms. Gaither [who] has agreed with me that she felt Ms. Crews was a target as well.

33.)   This Affidavit, in other words, attributed actions taken to terminate Ms. Crews' employment, even ones that Ms. Hurst herself signed off on, to the pressure and *animus* brought to bear on her by Mr. Sullivan.

34.)   The next month, Ms. Hurst was issued a Level 3, "Satisfactory" annual performance appraisal for FY 2017.  Each of her ratings on the individual critical elements except one had been lowered since the mid-year review, which took place before she engaged in protected EEO activity.

35.)   Ms. Gaither told Ms. Hurst that she had "fought" for the Level 3 rating, and that

Mr. Sullivan had wanted "something else."

36.)   The Satisfactory rating was a major departure from Ms. Hurst's previous performance ratings, which had been significantly higher, and did not reflect her actual performance during the FY 2017 rating cycle.

37.)   For example, in FY 2015, Ms. Hurst received an annual rating of Level 5, "Outstanding" by Mr. Stein, the former Deputy Director of the ELR Division who was Ms. Gaither's predecessor.

38.)   During Ms. Hurst's mid-year review for FY 2016, Mr. Stein advised her that she was on track to again receive a Level 5 rating.

39.)   Mr. Stein told Ms. Hurst that Mr. Sullivan, who had only joined the ELR Division a few months earlier, had pressured him to reduce Ms. Hurst's rating, but he had refused to do so.

40.)   Mr. Stein left the ELR Division in July of 2016, at which point Mr. Sullivan became Ms. Hurst's rating official.  He gave her an annual rating of Level 4 for FY 2016.

41.)   As for the Level 3 FY 2017 rating, Ms. Gaither did not provide any documentation or examples of Ms. Hurst's alleged performance shortcomings to support the rating, or to justify why it had been lowered since the mid-year.  Ms. Gaither's only explanation was that "morale was low" among Ms. Hurst's staff, a fact that was due to Mr. Sullivan's interference with her subordinates, not any action by Ms. Hurst.

42.)   Ms. Hurst did not receive any performance bonus for FY 2017.  On information and belief, she would have received one had her performance rating been higher.

43.)   Ms. Hurst timely initiated the administrative EEO complaints process over the FY 2017 rating and timely filed a formal complaint on March 29, 2018 (HUD-00045-2018) in which she alleged that the rating was the product of discrimination based on her race, color, and in

8

reprisal for her prior EEO activity.  This EEO activity included her own prior complaint as well as the EEO affidavit she provided in connection with Ms. Crews' complaint.

## Ms. Hurst's Intervention in Ms. Crews' Removal

44.)    Since proposing to remove Ms. Crews on September 15, 2017, as discussed in paragraph 25, Ms. Hurst had not been able to cope with her distress in having proposed Ms. Crews' removal.

45.)    In April of 2018, after the proposed removal had been pending for 8 months, Ms. Hurst voiced her concerns with Chief Human Capital Officer Brooks and conferred with the deciding official, former Deputy Chief Human Capital Officer Peter Constantine, who put questions to Ms. Hurst about the proposed action.

46.)    Ms. Hurst advised Mr. Constantine that but for pressure brought to bear on her by Mr. Sullivan, she would not have issued the proposal to remove Ms. Crews or taken any other performance-based action toward Ms. Crews.

47.)    On May 9, 2018, Mr. Constantine issued a Memo cancelling Ms. Crews' proposed removal.

48.)    Upon learning that Ms. Crews' proposed removal was rescinded, Mr. Sullivan demanded that Ms. Gaither and Ms. Hurst propose to remove Ms. Crews on pretextual grounds of misconduct.  They refused.

## Continued Reprisal Against Ms. Hurst

49.)    On June 29, 2018, approximately one month after Ms. Crews' removal action was rescinded, Ms. Hurst was issued a Letter of Reprimand, supposedly for being delinquent in paying her government credit card.  The letter warned that if Ms. Hurst failed to timely pay her government travel card again, or engaged in other misconduct, she could be subject to a

suspension or removal from the federal service.  The Reprimand was filed in Ms. Hurst's

Official Personnel Folder for a period of two years and was to be considered a "prior act of

discipline" for any future misconduct allegations.

50.)   The minor travel card delinquency was based on Ms. Hurst's unplanned absence

from the office due to illness, not any intentional delay on her part, and did not warrant a Letter

of Reprimand.

51.)   Ms. Hurst had been on Family Medical Leave Act leave for approximately 6 weeks

in April and May of 2018 after a trip to the Emergency Room due to high blood pressure.

During that time, she was not able to complete her travel voucher or upload credit card receipts

to the Government Travel System to be reimbursed for her travel expenses.

52.)   When she returned to work and learned that her payment was delinquent, Ms. Hurst

immediately contacted Government Card Services and arranged to make payment promptly,

which she did.

53.)   Ms. Gaither initially counseled Ms. Hurst about the delinquent payment; however,

a short time later, she issued the Letter of Reprimand.  Ms. Gaither apologized for having to

issue the letter and said she "fought" for counseling instead.  In other words, Mr. Sullivan had

forced her to take the discipline to a higher level.

54.)   On information and belief, Ms. Hurst was disciplined more harshly than a similarly

situated Branch Chief with a light complexion and no prior protected EEO activity, who was not

issued a Letter of Reprimand for being delinquent in paying her government credit card.

55.)   On information and belief, as a result of the Letter of Reprimand, Ms. Hurst

became ineligible to receive any monetary performance bonus for two years.

56.)   Ms. Hurst timely amended her EEO complaint (HUD-00045-2018) to include a

claim over the Letter of Reprimand.

**Ms. Hurst's First Request for Reasonable Accommodation**

57.)   Although Ms. Hurst was the author of the Memo proposing Ms. Crews' removal and the various performance-based actions that preceded and followed it, Ms. Hurst herself was being subjected to intense harassment by Mr. Sullivan and was suffering a steep emotional and physical decline.

58.)   On July 23, 2018, Ms. Hurst requested a reasonable accommodation of reassignment out of the ELR Division based on her documented medical conditions, including General Anxiety Disorder, Panic Disorder, and Major Depressive Episode.  The documentation she submitted in support of the RA request specifically noted that long-term exposure to a stressful/toxic work environment can cause a "fight-or-flight physiological reaction in a person" resulting in conditions such as hypertension, anxiety, panic attacks, stomach issues, nausea, muscle tension/pain, ulcers, and depression; and that Ms. Hurst was exhibiting several such conditions.

59.)   On September 21, 2018, the HUD Reasonable Accommodation Branch determined that Ms. Hurst was eligible for an RA.  On November 15, 2018, Ms. Gaither officially approved Ms. Hurst's request to be reassigned out of the ELR Division as a Reasonable Accommodation, as well as 2 days per week of telework until a new position was located.

60.)   Starting in February of 2019 and continuing until the fall of that year, with Ms. Gaither's express permission, Ms. Hurst began looking for a detail or rotational assignment while the agency was supposedly searching for a permanent position for her.

61.)   As described below in paragraphs 76 to 106, HUD failed to promptly and diligently pursue a reassignment for Ms. Hurst, which resulted in her being medically unable to accept the

11

reassignment that was finally offered to her in November of 2019 because it would have required her to relocate from Florida to Washington, D.C.

**Ms. Hurst's Unjustified Rating On Her FY 2018 Performance Appraisal**

62.)    After Ms. Crews' removal action was canceled, Ms. Gaither made it clear that Mr. Sullivan was targeting Ms. Hurst.

63.)    On December 4, 2018, Ms. Hurst was again issued a pretextually low Level 3 annual performance rating.

64.)    This rating was not in keeping with her actual performance for the FY 2018 rating cycle, which warranted a rating of Level 4 or higher, or her historical performance which had consistently been rated as Level 5 by managers other than Mr. Sullivan.  In both of the full performance years after Mr. Sullivan became the Director of ELR, Ms. Hurst received Level 3 ratings.

65.)    Mr. Sullivan unfairly scrutinized Ms. Hurst's performance in comparison with similarly situated Branch Chiefs who were outside of her protected groups and had not engaged in protected activity, and who – unlike Ms. Hurst – were given full autonomy to make managerial decisions about their staff.

66.)    Mr. Sullivan was responsible for the Level 3 rating.

67.)    Ms. Hurst did not receive a performance bonus for FY 2018.  On information and belief, she would have received one had she been rated higher.

**Retaliation Against Ms. Hurst After She Withdrew From Mediation**

68.)    On April 24, 2019, Ms. Hurst traveled from Miami to Washington, D.C. to attend a mediation over her EEO complaint (HUD-00045-2018).  Several days earlier, the Resolving Official for the mediation had been changed from a disinterested manager outside of the ELR

Division to Ms. Gaither, who, along with Mr. Sullivan, had been named as a responsible management official in Ms. Hurst's complaint.

69.)     Ms. Hurst objected and asked that the previous Resolving Official be reinstated. When she arrived in D.C., Ms. Hurst learned that Ms. Gaither would remain as the Resolving Official.  Knowing of Ms. Gaither's antagonism toward her as a result of being Mr. Sullivan's Deputy, Ms. Hurst withdrew from the mediation.

70.)     Nevertheless, Ms. Hurst reported to the ELR Division where she planned to meet with her staff and customers, all of whom were based in D.C.

71.)     While Ms. Hurst was at the D.C. office, Ms. Gaither asked the status of her pending RA reassignment.  Ms. Gaither said that if a reassignment were not found, Ms. Hurst could be removed for "medical inability to perform."  Ms. Gaither said that Mr. Sullivan had pointed to an email from Ms. Hurst in which she had casually apologized for being "distracted" about something minor as evidence that Ms. Hurst could not perform her job.

72.)     Ms. Gaither said that Mr. Sullivan had been asking about the reassignment and that a removal letter would be the next step, meaning Ms. Hurst's job was in jeopardy.

73.)     Ms. Hurst timely filed a second EEO complaint over her FY 2018 appraisal and the events of April 24, 2019 (HUD-00049-2019), which she alleged had been the result of discrimination based on her race and color and reprisal for her protected activity.

**Ms. Hurst's Continued Protected Activity In Support of Ms. Crews' EEO Complaint**

74.)     On August 7, 2019, Ms. Hurst provided another affidavit during the investigation into one of Ms. Crews' administrative EEO complaints.  She spoke to the atmosphere in the ELR Division under Mr. Sullivan and his targeting Ms. Crews.  In her words:

> I believe the ELRD staff are in a hostile environment and have been since Joe Sullivan's arrival.  All complaints to address the issue went ignored.

I'd had many conversations with Sonya Gaither [Mr. Sullivan's deputy] about how she and I both believed [Mr. Sullivan] was out to get Anita. Our discussions centered around how he seemed to focus on her. Sonya told me that Anita 'had a target on her back.'

I said to Sonya that what she was sharing with me [about Mr. Sullivan attempting to have Ms. Crews charged with misconduct] sounded disturbing . . . Joe seemed to a have a microscope on Anita.

75.)     Ms. Hurst also explained that Ms. Crews' request to OCHCO to conduct an investigation into the hostile work environment created by Mr. Sullivan was dismissed by Chief Human Capital Officer Brooks, who substituted a "climate assessment" that did not look into whether Mr. Sullivan had created a hostile work environment.

**HUD's Unreasonable Delay And Failure To Implement Ms. Hurst's Reassignment
And The Tangible Harm Done To Her As A Result**

76.)     Between December of 2018 and August of 2019, HUD conducted three searches for available positions into which Ms. Hurst could be reassigned. The first search was erroneously restricted to positions located in Florida based on HUD's misunderstanding of Ms. Hurst's criteria, and did not yield any results. A second, more expansive search was performed for positions that were stationed in Florida or that were portable, meaning they could be performed remotely from Florida. That search was also erroneously restricted to non-supervisory positions, so a limited third search was performed for vacant supervisory positions up to the GS-14 grade level.

77.)     In the meantime, in February of 2019, Ms. Hurst sought and received approval from Ms. Gaither to look for a detail while the search for a new position was being conducted.

78.)     On May 22, 2019, Ms. Hurst was provided a list of GS-13 and GS-14 positions for which she was qualified, all of which were vacant. She was asked to rank them in order of preference, which she did that same day. Her top-ranked position was a GS-14 Management Analyst position in Office of Chief Financial Officer ("OCFO"). On information and belief, that

14

position could have been performed remotely from Florida.

79.)     Ms. Hurst followed up on the status of these positions, but was not given any information until June 21, 2019, when she was told that none was available.  She was told that the OCFO position – her top choice – had been filled, and that her second choice could only be performed in Washington, D.C.

80.)     For several months thereafter, Ms. Hurst and her counsel repeatedly asked the RA Branch to explain why the OFCO position had been filled after she indicated her interest in being reassigned into it as an accommodation.  Ms. Hurst also sought an explanation for why the other position had to be performed in D.C.  She never received a response to her inquiries.

81.)     Ms. Hurst was later told by Ms. Gaither that the RA Branch had failed to timely alert OCFO that she was available for non-competitive reassignment into the position.

82.)     In September of 2019, defendant notified Ms. Hurst that it had completed two searches for vacant, funded GS-13 or GS-14 positions into which she could be reassigned as an accommodation, which it claimed satisfied its obligation to her.  Defendant reluctantly offered to run one additional "targeted search" for GS-13 positions, even though Ms. Hurst had never asked that the search be limited to that grade level.

83.)     In November of 2019, HUD identified 5 Management Analyst positions into which Ms. Hurst could be reassigned.  Four of the positions were based in Washington, D.C. and one was based in Texas.  In order to accept any of the positions, Ms. Hurst would have had to relocate outside of Florida, where she had been living and successfully working remotely for the previous 4 years, and where her doctors, family, and support system were located.

84.)     Ms. Hurst believed that she had to select one of the positions because the RA office told her that it would not be conducting any further searches.  Accordingly, she selected a non-

supervisory GS-14 Management Analyst position in the Office of General Counsel ("OGC") in Washington, D.C.

85.)   By that time – 16 months after she initiated the RA process in July of 2018 – Ms. Hurst's medical conditions had significantly progressed.  She was suffering from severe abdominal pain, unpredictable and urgent gastrointestinal distress that prevented her from being far from restroom facilities, sleeplessness, and frequent panic attacks, among other symptoms.  Also, as a result of HUD's unreasonable delay, she had been forced to use all of her sick and annual leave and take a significant amount of unpaid leave.

86.)   Due to her deteriorated condition, Ms. Hurst was unable to relocate outside of Florida, as a cross-country move would have greatly exacerbated her stress, disrupted her medical treatment, taken her away from her family and social support network, and caused her medical conditions to become even more uncontrolled, as attested by her doctors.  Additionally, a move of that nature was beyond Ms. Hurst's physical capability.

**Ms. Hurst's Second Request For Reasonable Accommodation And HUD's Denial**

87.)   Rather than turn down the OGC position, Ms. Hurst submitted a second RA request to be permitted to perform it remotely from Florida.  She also sought temporary full-time telework.

88.)   Ms. Hurst included with her RA request medical documentation confirming that she suffered from Major Depressive Disorder, General Anxiety Disorder, and Panic Disorder as well as symptoms such as "social anxiety, frequent panic attacks, chronic diarrhea, and lack of bowel control."  The documentation stated that excessive stress was not medically advisable, and that geographical relocation has been shown to be one of the biggest stressors in a person's life. Ms. Hurst's medical provider stated that such a move could be "devastating and detrimental" to her mental *and* physical health and strongly recommended that she be permitted to telework from

Florida.  A second medical letter stated, "All of Ms. Hurst's conditions can be exacerbated by stress and would likely worsen if she were required to relocate to Washington, D.C. …"

89.)     On December 16, 2019, Tenille Washburn, the Assistant General Counsel, Field Management and IT Division in HUD's Office of General Counsel ("OGC"), denied Ms. Hurst's RA request because the essential functions of the GS-14 OGC position, which supposedly included "physically replacing printer toner" and "physically moving computers," required the incumbent to be physically located in Washington, D.C.  Neither of those duties was essential to the position.

90.)     Ms. Hurst could have performed all of the *actual* essential functions of the non-supervisory OGC position from Florida.  She had been successfully performing her supervisory GS-14 position in the ELR Division remotely for more than 4 years.  During that time, Ms. Hurst not only supervised 6 subordinates, but she routinely provided advice and guidance to high-level officials, including Senior Executive Service-level managers, in the Office of General Counsel and the Community Planning and Development program office, among others.

91.)     On information and belief, many of the agency's Management Analyst positions are performed remotely.

92.)     Ms. Hurst appealed Ms. Washburn's decision to the Deputy General Counsel for Operations in OGC, who upheld the denial.

93.)     Ms. Hurst then appealed to the agency's Reasonable Accommodation Committee ("RAC").  She expressly incorporated all of the medical documentation she had previously submitted to the agency regarding her physical and mental health conditions.  On February 27, 2020, the RAC issued a decision which failed to acknowledge that the agency's RA office had found Ms. Hurst to be a qualified individual with a disability; to address any of Ms. Hurst's medical documentation; or to explain why the essential functions of the OGC Management Analyst

position could not be performed remotely from Florida.

94.)    The RAC decision gave Ms. Hurst 45 days from the date of issuance to relocate and begin working in the OGC position in either of two buildings, both located in Washington, D.C.  The decision did not mention the possibility of telework at all.

95.)    Ms. Hurst had no option but to decline the position on March 11, 2020.

96.)    Ms. Hurst had filed a third EEO complaint (HUD-00188-2019) on October 25, 2019 over HUD's unreasonable delay in implementing her reasonable accommodation, which effectively denied her an RA and caused her to use her sick and annal leave and take unpaid leave, as well as its failure to detail her out of the ELR Division while she was waiting on a reassignment.

97.)    In March of 2020, Ms. Hurst timely amended that complaint to add claims of discrimination on the basis of disability and failure to accommodate when the RAC upheld the denial of her second RA request in February of 2020.

**Ms. Hurst's Third Request for Reasonable Accommodation and HUD's Denial**

98.)    Beginning in mid-March of 2020, with the outbreak of the Covid-19 pandemic in the United States, HUD mandated that all of its employees work from home full-time indefinitely.

99.)    This included the Management Analyst position in OGC which, to Ms. Hurst's knowledge, had not been filled since she was forced to decline it just days before.

100.)    Accordingly, on March 20, 2020, Ms. Hurst submitted a request to the RA Branch to be detailed to the OGC position, or to another temporary or permanent position that she could perform remotely from Florida, while the agency was under mandatory telework.  The RA office treated this as a new RA request.

101.)    On March 30, 2020, Ms. Hurst submitted updated medical documentation from her OBGYN explaining that she recently had been diagnosed with a severe hormonal imbalance and

painful uterine fibroids that would require surgery imminently.  The documentation stated that a "hormone imbalance can cause or exacerbate a number of conditions … including depression and anxiety," both of which Ms. Hurst already suffered from.  Her provider advised that Ms. Hurst needed to work from home to manage her conditions and minimize sources of stress that could worsen her symptoms.  Ms. Hurst also expressly incorporated all of the medical documentation she had previously submitted to the agency regarding her physical and mental health conditions.

102.)   While Ms. Hurst's RA request was pending, a senior manager from the Office of Public and Indian Housing, a program office outside of OCHCO, formally offered her a detail assignment with a flexible start date and duration.  Ms. Hurst immediately advised the RA office and Ms. Gaither of the opportunity.

103.)   On April 14, 2020, after evaluating Ms. Hurst's OBGYN letter, the RA Branch determined that she was functionally limited in requiring access to a bathroom, that she experienced difficulty leaving her home or working outside of the home, and she was limited in engaging in strenuous activity.   The RA Branch asked Ms. Hurst to provide additional documentation addressing how stress was a functional limitation, which she agreed to do.

104.)   On April 29, 2020, Ms. Hurst provided a supplemental medical letter from her psychiatric provider detailing how her mental health conditions, in particular her anxiety and panic disorders, had worsened as a result of the global pandemic, and advising that she needed to be reassigned from her current work environment to bring her conditions under control.

105.)   Despite knowing that Ms. Hurst was planning to submit this additional documentation, and regardless of previously approving Ms. Hurst to look for and find a detail on her own, Ms. Gaither refused to permit Ms. Hurst to go on the detail outside of OCHCO.

106.)   On April 29, 2020, Ms. Gaither denied Ms. Hurst's RA request on the pretext that

Ms. Hurst was already teleworking and because the OBGYN letter alone was insufficient to justify the detail. As Ms. Gaither well knew, Ms. Hurst had previously submitted considerable medical documentation in addition to the OBGYN letter justifying her need for reassignment outside of OCHCO, which HUD had found she was entitled to.

## Ms. Hurst's Permanent Reassignment To Public And Indian Housing

107.)   When Ms. Hurst advised the managers in Public and Indian Housing that her RA request for a detail to that Office had been denied, the Deputy Assistant Secretary for the Office of Operations offered her the job on a permanent basis.

108.)   In June of 2020, Ms. Hurst was non-competitively reassigned to the GS-14 position of Supervisory Management and Program Analyst position in that Office. She has been successfully working from home full-time since then.

## Exhaustion of Administrative Remedies

109.)   On December 21, 2017, Ms. Hurst timely initiated the informal agency EEO process over the Level 3, Satisfactory performance appraisal that was issued to her for FY 2017. She timely filed a formal complaint over that claim on March 29, 2018 (HUD-00045-2018). On August 10, 2018, HUD amended that complaint to add a claim over the June 29, 2018 Letter of Reprimand. On or before October 30, 2019, Ms. Hurst filed a request for a hearing with the Equal Employment Opportunity Commission ("EEOC"). In June of 2020, Ms. Hurst withdrew her hearing request and the EEOC remanded the complaint to the agency for a Final Agency Decision ("FAD"). More than 180 days have elapsed from the date of the initial complaint without the issuance of a FAD.

110.)   On January 18, 2019, Ms. Hurst timely initiated the informal agency EEO process over the Level 3, Satisfactory performance appraisal that was issued to her for FY 2018; and her

subjection to a hostile work environment when, on April 24, 2019, her job was threatened and she was ordered to return to Miami from Washington, D.C.  She timely filed a formal complaint over those claims on May 8, 2019 (HUD-00049-2019).  The agency issued an FAD on that complaint on July 31, 2020.

111.)   On September 10, 2019, Ms. Hurst timely initiated the informal agency EEO process over HUD's failure, since October of 2018, to work in a diligent manner to identify a suitable position for her RA reassignment; its refusal to respond to her requests for information about the RA reassignment; and its denial of her request for a detail or rotation while the agency looked for an appropriate permanent reassignment.  She timely filed a formal complaint over those claims on October 25, 2019 (HUD-00188-2019).   On March 31, 2020, HUD amended that complaint to add a claim over the agency's denial of Ms. Hurst's second RA request on February 2, 2020.  On June 19, 2020, HUD again amended the complaint to add a claim over the agency's denial of her third RA request on April 29, 2020.  HUD issued the administrative Report of Investigation on October 5, 2020.  More than 180 days have elapsed from the date of the initial complaint without the issuance of a Final Agency Decision.

112.)   In all of the foregoing ways and others, to the extent required by law, Ms. Hurst has exhausted the administrative remedies available to her about the claims she is raising in this action.

### COUNT I
### (Reasonable Accommodation – Unreasonable Delay,
### Failure to Implement, Tangible Harm, Denial)

113.)   Ms. Hurst incorporates the allegations contained in paragraphs 1 through 112 above, as though fully set forth here.

114.)   Ms. Hurst first requested Reasonable Accommodation from defendant on July 23, 2018.   Ms. Hurst's request for Reasonable Accommodation was supported with medical

documentation which included specific diagnoses of her psychological conditions, and a description of their symptoms and effects on her daily life. The medical documentation in support of Ms. Hurst's request also contained treatment recommendations, including reassignment out of the Employee and Labor Relations Division.

115.)   At all times relevant, Ms. Hurst was an individual who had a psychological disability, specifically Anxiety Disorder, Panic Disorder, and Major Depressive Episode; had a record of that disability; and/or was regarded by defendant as having that disability.

116.)   Ms. Hurst's disability substantially limited her in one or more major life activities including normal brain function. Her psychological conditions caused her to suffer panic attacks with intense chest pain, a deeply depressed emotional state, difficulty concentrating, fatigue, overwhelming anxiety, feelings of depersonalization, and fear of impending doom at a clinically diagnostic level far in excess of disruption in euthymia and concentration experienced by most people in their daily lives.

117.)   Ms. Hurst's disability substantially limited her ability to care for herself; to interact socially with family and friends; to maintain an affect and outlook on life appropriate to the events she engaged in and was faced with; and to sustain feelings of self-worth. It caused Ms. Hurst to make several trips to the emergency room for severe chest and abdominal pain and high blood pressure; caused her to lose control of her bowels; significantly disrupted her sleep; and regularly caused uncontrolled crying spells.

118.)   Ms. Hurst also suffered from an ovarian cyst, large uterine fibroids, a hormonal imbalance, and gastrointestinal conditions that required her to use the restroom urgently. Ms. Hurst's ovarian cyst and/or uterine fibroids caused intense abdominal pain and either caused or contributed to her gastrointestinal distress. They substantially limited her ability to work outside

22

of the home or to be in public places without quick and reliable access to bathroom facilities.

119.)    With or without Reasonable Accommodation, at all times relevant, Ms. Hurst was able to perform the essential functions of her job or an equivalent job with defendant.

120.)    At all times relevant, Ms. Hurst was a qualified individual with a disability and/or regarded by defendant as a qualified individual with a disability who was entitled to Reasonable Accommodation, as those terms are defined under 29 U.S.C. §794 (incorporating 42 U.S.C. §12112).

121.)    Reasonable Accommodation taking the form of reassignment out of the Employee and Labor Relations Division and temporary full-time telework were the accommodations needed to accommodate Ms. Hurst's disabilities.  Reassigning Ms. Hurst would not have caused defendant undue hardship.

122.)    On September 21, 2018, defendant's Reasonable Accommodation Branch determined that Ms. Hurst was a qualified individual with a disability and entitled to Reasonable Accommodation.

123.)    On November 15, 2018, Ms. Gaither officially approved Ms. Hurst's request to be reassigned out of the Employee and Labor Relations Division as a Reasonable Accommodation, as well as 2 days per week of telework until a new position was located.

124.)    Between November of 2018 and November of 2019, defendant significantly and unreasonably delayed Ms. Hurst's reassignment, causing her to exhaust her sick and annual leave and take significant amounts of leave without pay and effectively denying her a reasonable accommodation by, among other things, failing to respond for months at a time to her requests for information on the status of her reassignment; failing to diligently search for a suitable new position; denying her requests to be given a detail or rotation out of Employee and Labor Relations

23

while she was awaiting reassignment; failing to timely notify the Office of the Chief Financial Officer in May of 2019 that Ms. Hurst was available for reassignment to the vacant GS-14 Management Analyst Position as an accommodation; and failing to timely notify the other offices that had vacant positions available in or after May of 2019 that Ms. Hurst was available for reassignment as an accommodation.

125.)   On February 27, 2020, defendant wrongfully denied Ms. Hurst's request for Reasonable Accommodation to perform the GS-14 Management Analyst position in the Office of General Counsel remotely from Florida, and for temporary full-time telework, despite the fact that she was a qualified individual with a disability who could perform the essential functions of that position remotely.  Permitting Ms. Hurst to perform the OGC position remotely and/or granting her full-time telework would not have been an undue hardship for defendant.

126.)   On April 29, 2020, defendant wrongfully denied Ms. Hurst's request for Reasonable Accommodation to be detailed or reassigned into a position she could perform remotely from Florida while teleworking full-time despite the fact that she was a qualified individual with a disability who was entitled to her requested reasonable accommodation. Permitting Ms. Hurst to perform a detail position remotely from Florida while teleworking would not have been an undue hardship for defendant, particularly during the Covid pandemic when nearly all HUD staff were teleworking.

127.)   Defendant's unreasonable delay in reassigning Ms. Hurst out of the Employee and Labor Relations Division and its denial of her second and third requests for accommodation caused injury to her by needlessly exacerbating and continuing the impact of her disabilities and the limitations of her major life activities identified in paragraphs 115 to 118 above, and causing her to exhaust her sick and annual leave and take a significant amount of unpaid leave, and thereby

violated the Rehabilitation Act, 29 U.S.C. §§ 791 et seq.

128.)   Defendant's violation of the Rehabilitation Act caused Ms. Hurst to suffer injury to her career, pecuniary loss, exacerbation of her medical conditions, emotional pain, humiliation, mental anguish, and loss of enjoyment of life.

**COUNT II**
**(Retaliation – Materially Adverse Actions)**

129.)   Ms. Hurst incorporates the allegations contained in paragraphs 1 through 128 above, as though fully set forth here.

130.)   Beginning no later than June of 2017, Ms. Hurst participated in the following activities protected under 42 U.S.C. §2000e-16, and 29 U.S.C. §791(g), among others:

a. Initiating the informal administrative discrimination complaints process on June 22, 2017 (HUD-00093-2017) and participating in the Alternative Dispute Resolution process in connection with that complaint;

b. Initiating the informal administrative discrimination complaints process on December 21, 2017 (HUD-00045-2018); filing a formal administrative complaint of discrimination as part of that complaint process on March 29, 2018; and amending that complaint on August 10, 2018;

c. Initiating the informal administrative discrimination complaints process on January 18, 2019 (HUD-00049-2019); and filing a formal administrative complaint of discrimination as part of that complaint process on May 8, 2019;

d. Initiating the informal administrative discrimination complaints process on September 10, 2019 (HUD-00188-2019); filing a formal administrative complaint of discrimination as part of that process on October 25, 2019; and amending that complaint on March 31 and June 19, 2020;

e. Filing requests for Reasonable Accommodation on July 23, 2018; November 21, 2019; and March 20, 2020;

f. Continuing with each of the foregoing administrative processes and by initiating and pursuing this civil action; and

g. Providing affidavits in support of Anita Crews' EEO complaints in which she identified Mr. Sullivan as having targeted Ms. Crews and treated her disparately on account of her race, color and/or protected activity.

131.)   Beginning no later than November 29, 2017, defendant subjected Ms. Hurst to one or more materially adverse actions because she participated in one or more protected EEO and Rehabilitation Act processes and activities identified above, while simultaneously unreasonably delaying and failing to implement her reassignment and denying her requests for Reasonable Accommodation, by the following actions among others:  Issued her a Level 3 (Satisfactory) annual performance rating for FY 2017, causing her to lose a performance bonus; issued her an Official Letter of Reprimand on June 29, 2018, causing her to be ineligible for a performance bonus for two years; issued her a Level 3 (Satisfactory) annual performance rating for FY 2018, causing her to lose a performance bonus; repeatedly told her that she was a target of Mr. Sullivan and that her job was in jeopardy; threatened to issue a proposal to remove her on April 24, 2019 on the false and pretextual basis that she was not medically competent to perform her job; denied her request to be placed on a detail assignment out of the Employee and Labor Relations Division and away from the hostile work environment created by Mr. Sullivan pending permanent reassignment; and unreasonably delayed, denied and/or failed to implement her requests for Reasonable Accommodation.

132.)   By taking one or more of the foregoing actions, singly or in combination, defendant

took materially adverse actions against Ms. Hurst that would dissuade a reasonable worker from making or supporting a charge of discrimination, opposing unlawful employment practices, or requesting Reasonable Accommodation.

133.)   By taking one or more of the foregoing actions, defendant violated 42 U.S.C. §2000e-16 (incorporating 42 U.S.C. §2000e-3(a)), and 29 U.S.C. §791(g) (incorporating 42 U.S.C. §12203).

134.)   Defendant's violation of Title VII and the Rehabilitation Act caused Ms. Hurst to suffer pecuniary loss, injury to her career, exacerbation of her medical conditions, emotional pain, humiliation, mental anguish, and loss of enjoyment of life.

### COUNT III
### (Discrimination – Tangible Adverse Employment Actions)

135.)   Ms. Hurst incorporates the allegations contained in paragraphs 1 through 134 above, as though fully set forth here.

136.)   Ms. Hurst is an African American female of dark color.

137.)   Defendant took one or more of the following tangible adverse employment actions against Ms. Hurst based on her race and/or her color:  Issued her a Level 3 (Satisfactory) annual performance rating for FY 2017, causing her to lose a performance bonus; issued her an Official Letter of Reprimand on June 29, 2018, causing her to be ineligible for a performance bonus for two years; issued her a Level 3 (Satisfactory) annual performance rating for FY 2018, causing her to lose a performance bonus; denied her request to be placed on a detail assignment out of the Employee and Labor Relations Division and away from the hostile work environment created by Mr. Sullivan pending permanent reassignment; and unreasonably delayed, denied and/or failed to implement her requests for Reasonable Accommodation.

138.)   By the foregoing actions, defendant discriminated against Ms. Crews because of

her race and/or her color, and thereby subjected her to adverse employment action in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-16.

139.)   Defendant's violation of Title VII caused Ms. Hurst to suffer pecuniary loss, injury to her career, exacerbation of her medical conditions, emotional pain, humiliation, mental anguish, and loss of enjoyment of life.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff Keisha Hurst respectfully requests that the Court enter judgment in her favor and award her the following relief.

A.     An Order declaring that defendant violated plaintiff's rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16, and the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§791 et seq., and restraining and enjoining defendant from further violations.

B.     Record correction including, but not limited to, expungement of:  a.) her FY 2017 and FY 2018 performance appraisals; and b.) the June 29, 2018 Letter of Reprimand.

C.      Backpay for the unpaid leave and restoration of the sick and annual leave she was forced to take between July of 2018 and the present as a result of HUD's unreasonable delay, failure to implement, and/or denial of her requests for Reasonable Accommodation.

D.     Backpay for the lost performance bonuses in FY 2017 and FY 2018.

E.     Compensatory damages.

F.     An award of the attorneys' fees and costs incurred in the prosecution of this action and in the administrative EEO complaints processes that preceded it.

G.     Such other relief as may be appropriate.

**JURY DEMAND**

Plaintiff requests a trial by jury of all issues so triable.

Respectfully submitted,

_____//s//_____
Robert C. Seldon, Esq.
 D.C. Bar No. 245100

_____//s//_____
Charlene Bofinger, Esq.
 D.C. Bar No. 368879

_____//s//_____

Molly E. Buie, Esq.
 D.C. Bar No. 483767
Seldon Bofinger & Associates, P.C.
1319 F Street, N.W., Suite 200
Washington, D.C. 20004
(202) 393-8200
Counsel for Plaintiff